**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**DOE 1, ET AL.**

                        Plaintiffs,

      v.

**EQUAL EMPLOYMENT OPPORTUNITY**
**COMMISSION, ET AL.**

                      Defendants.

Case No. 1:25-cv-01124 (RBW)

---

## <u>DECLARATION OF MARY KATHERINE LITTLEJOHN</u>

I, Mary Katherine Littlejohn, declare as follows:

1.  I have been an employee of the U.S. Equal Employment Opportunity Commission (EEOC) since February 2022.  I served as an Attorney Advisor to Commissioner Andrea Lucas from April 2024 to January 2025.  In January 2025, I became an Attorney Advisor in EEOC's Office of the Chair.  In my current capacity, I have access to the lawfirmDEI@eeoc.gov email inbox, and I have knowledge and information regarding the matters addressed below.

2.  The EEOC is a bipartisan Commission comprised of up to five Presidentially-appointed members, called "Commissioners."  The President designates one of the Commissioners as Chair and may designate another as Vice Chair.  The Chair of the EEOC is responsible for the administration and implementation of policy and the financial management and organizational development of the Commission.  The Commissioners (including the Chair and the Vice Chair) participate in the development and approval of Commission policies, issue charges of discrimination where appropriate, and authorize the filing of lawsuits directly or via delegation.

3.      The EEOC is responsible for enforcing Title VII with respect to, among other covered entities, private sector employers.[1]  Such enforcement efforts include receiving, investigating, and resolving charges of discrimination.[2]  Individual EEOC Commissioners, including the Chair, also have the authority to file charges of discrimination, often called "Commissioner's Charges."[3]

4.      On March 17, 2025, EEOC Acting Chair Andrea Lucas sent letters to 20 law firms requesting information about their employment practices (hereinafter, the "letters").[4]  The letters note concerns that some firms' employment practices, including those labeled or framed as diversity, equity, and inclusion (DEI), may entail unlawful disparate treatment in terms, conditions, and privileges of employment, or unlawful limiting, segregating, and classifying based on race, sex, or other protected characteristics, in violation of Title VII of the Civil Rights Act of 1964 (Title VII).[5]

5.      The EEOC's Compliance Manual authorizes, among other individuals, Commissioners and agency staff to engage in informal information gathering prior to issuance of a Commissioner's Charge to determine whether to file or recommend that a Commissioner's Charge be issued.  EEOC Comp. Man. Vol. 1, § 8.2 ("While aggrieved persons initiate most EEOC actions, EEOC may receive information from a Commissioner, any of its staff, or any outside source on potential violations of the statutes."); *id.* at § 8.1 ("Respondents may be

---

[1] 42 U.S.C. § 2000e-5.

[2] *Id.*

[3] 42 U.S.C. § 2000e-5(b) (referring to charges "filed by or on behalf of a person claiming to be aggrieved, *or by a member of the Commission*" (emphasis added)); 29 C.F.R. § 1601.11(a) ("Any member of the Commission may file a charge with the Commission.").

[4] Press Release, EEOC, EEOC Acting Chair Andrea Lucas Sends Letters to 20 Law Firms Requesting Information About DEI-Related Employment Practices (Mar. 17, 2025) https://www.eeoc.gov/newsroom/eeoc-acting-chair-andrea-lucas-sends-letters-20-law-firms-requesting-information-about-dei.

[5] *Id.*

identified . . . in the absence of an individual charge or when the bases/issues to be investigated are not adequately covered by a pending individual charge."); *id*. at § 8.2(b) ("An important part of the enforcement process lies in determining in advance which establishments most need to be investigated."); *id*. at. § 8.2(b)(4) (identifying potential source of leads regarding possible violations); *id*. at § 14.2 ("There are occasions when compliance activity before . . . service of a charge is appropriate . . . [T]his may either be for enforcement reasons or because early settlement is clearly appropriate."); *id*. at § 14.2(d)(1) (permitting witness interviews before charges have been served to obtain evidence indicating possible legal violations, including from witnesses "who may have key information or may be able to verify key information (an incident described or key records available)," and witnesses "who are custodians of records or who may be able to provide essential information on actual policies, recordkeeping practices, location of records, etc."). The EEOC Compliance Manual distinguishes between such informal activity and an "investigation." *See, e.g., id*. at § 8.6(b)(2)(ii). Attached hereto as Exhibit 1 are true and correct copies of the above-referenced sections of the EEOC Compliance Manual. As these sections reflect, informal information gathering preceding the issuance of a Commissioner's Charge can occur in a variety of ways, including through accessing public sources, such as news articles or job postings, and also by obtaining information from other government agencies, unions and trade associations, and civil rights organizations.

6.     The letters constituted informal information gathering and were not a component of any investigation.

7.     The letters do not state that compliance was mandatory, and the recipients were not required to provide the information requested in the letters. Indeed, as of the date of this

declaration, the responses to the letters varied, with most law firms failing to provide any of the requested information.

8.      The letters requested that any information be sent to lawfirmDEI@eeoc.gov for consideration by April 15, 2025.  The Acting Chair considers the time period for recipients to respond to the letters as having concluded.

9.      The EEOC has not received any recent communications from any letter recipient stating or indicating that it intends to submit any further response to the requests for information in the letters.  The EEOC does not anticipate receiving additional information from the letter recipients in response to the requests for information in the letters.

10.     To the extent that any of the requested information was provided to the EEOC by a letter recipient in response to the letters, such information did not include names, email addresses, phone numbers, or other personally identifying information of any employee or applicant.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 30th day of July, 2025.

MARY LITTLEJOHN
Digitally signed by MARY LITTLEJOHN
Date: 2025.07.30 18:58:19 -04'00'

Mary Katherine Littlejohn
Attorney Advisor
Office of the Chair
U.S. Equal Employment Opportunity Commission

# EXHIBIT 1

VitalLaw® 

## §8.1, *Introduction*, Equal Employment Opportunity Commission

EEOC Compliance Manual
EEOC Compliance Manual ¶371

Click to open document in a browser

This section covers intake procedures for Title VII and ADA commissioner charges and ADEA/EPA directed investigations. Respondents may be identified and scheduled for investigation either in the absence of an individual charge or when the bases/issues to be investigated are not adequately covered by a pending individual charge. It is Commission policy, within available resources, to follow up on all information received which may point to a violation of one of the statutes. It is the objective of the Commission's pattern and practice program to investigate and eliminate, via Commissioner charges, directed investigations, and appropriate individual charges, discrimination in employment patterns and practices which has or could have an impact on a class of employees or applicants for employment.

**(a) *The Need for Commission Initiated Investigations.*—**While the principal means for implementing Commission policy is the investigation of individual charges, EEOC initiated investigations are a necessary part of the enforcement process. Discrimination victims are often unaware of their rights or unaware of discriminatory practices. While this is typically so in cases of systemic discrimination, it is also true in cases where discrimination is less pervasive. Field offices should not hesitate to recommend Commissioner charges or initiate directed investigations when such action will fulfill EEOC's law enforcement mission.

**(b) *Statutory Differences in Procedures.*—**Under Title VII/ADA, EEOC must have a basis to investigate possible violations and must obtain a Commissioner charge and notify the respondent of such basis by specifying the date, place and circumstances to be covered by the investigation. Under ADEA/EPA, there are no prerequisites which must be met to investigate. However, the main operational difference between the laws is the Title VII/ADA charge filing and notice requirement, i.e., a Commissioner charge must be obtained from headquarters and notice of it must be given to the respondent. Thus, the guidance provided in §8.2 attempts to provide a common basis under all four laws for determining when an EEOC initiated investigation is merited.

© 2025 CCH Incorporated and its affiliates and licensors.
All rights reserved.

VitalLaw® 

## §8.2, *Sources of Information and Scheduling Considerations*, Equal Employment Opportunity Commission

EEOC Compliance Manual
EEOC Compliance Manual ¶372

Click to open document in a browser

While aggrieved persons initiate most EEOC actions, EEOC may receive information from a Commissioner, any of its staff, or any outside source on potential violations of the statutes.

**(a) *Maintenance of Lead File.*—**Enforcement management should maintain an alphabetical file of potential respondents for retention of intake leads (see §2.7(c)), information obtained while investigating other cases, respondent lists, and leads submitted by investigators. Include a divider for respondents not immediately identified by lead information. Investigators should promptly report any information received on potential violations to Enforcement Management. For example, a complaining party who waited too long to timely file an ADA charge may present direct evidence of an ADA *per se* violation (e.g., pre-employment medical inquiries documented on the company application form). If action is deferred on any item, place it in the file for future reference. For example, an analysis of CDS data may justify an investigation of a particular respondent which is not made because of resource limitations. Review the file on a continuing basis when Commissioner charges or directed recommendations are being developed and when charges are received from intake.

**(b) *Investigation Leads.*—**An important part of the enforcement process lies in determining in advance which establishments most need to be investigated. All staff members are encouraged to participate in directed programming through the submission of leads and recommendations for additions, deletions, or other modifications to office guidance or data on identifying potential respondents. Productive leads may be developed from the following sources with appropriate local variations:

**(1) *Charge Data System (CDS) and EEO Reports.*—**In some cases, use of the CDS and EEO reports in tandem may provide easier access to information. An initial approach may be to identify respondents with a large number of charges. Resort may then be made to interviews of charging parties to explore trends or patterns or as sources of information about a potential respondent. Place documentation on promising prospects which do not result in investigations because of resource limitations in the lead file.

**(2) *Investigative Activity.*—**Leads may be based on prior enforcement experience about specific types of respondents which provides a reasonable basis for investigating a particular respondent. Leads may result at intake when no charge is filed (because the person chose not to, or for jurisdictional/coverage reasons such as untimeliness, e.g., an ADA charge not filed because the party had no covered disability) or the person files against a different respondent. Statements of respondents, present/former employees, or unsuccessful applicants made during investigations may yield leads on probable violations by other employers or by unions or employment agencies; respondent records, such as job orders or referral records, may provide similar leads. There may be evidence of a Title VII/ADA violation by a charged respondent which cannot be addressed by an existing charge or which becomes apparent during an ADEA/EPA investigation. The legal unit may advise that Title VII/ADA litigation would be strengthened by a new charge addressing related issues.

**(3) *Information from the Media.*—**Business articles may describe discriminatory reductions in force or other practices or may contain stereotypical statements of respondent officials based on age, sex, or disability. Classified ads may state or imply age, sex, non-disability, or other preferences. Enforcement management should establish a system for review of classified advertising as needed as a basis for generating directed activity. See §8.6 for procedures in advertising cases.

© 2025 CCH Incorporated and its affiliates and licensors.          1          Jul 23, 2025 from VitalLaw®
All rights reserved.



**(4) *Relationships with Other Agencies*.—**Staff of other agencies, such as FEPAs or the State Employment Service, may provide leads on probable violations. The OFCCP may refer information about unions or other potential respondents which are not within its jurisdiction.

**(5) *Union and Trade Association Officials*.—**Appearances before these groups have a beneficial effect on enforcement efforts, and these contacts give investigators information on industry and trade practices which can result in productive leads.

**(6) *Prior History of Discrimination Allegations*.—**Annual EEO reports; data from other EEO agencies, such as OFCCP, including records of activity on the main offices of respondents; charges filed with state or local FEPAs and referred to and/or filed with EEOC; and information on FEPA dispositions are all productive sources for determining if an EEOC initiated action is appropriate.

**(7) *Expanded Presence Program*.—**Expanded Presence Program activity may generate leads on potential violations.

**(8) *Civil Rights Organizations*.—**Ongoing contact with representatives of civil rights organizations, including women's rights, disability rights, older worker groups, can be an excellent source of leads.

**(9) *Employment Agencies*.—**Leads may result from investigating a client employer, or vise-versa, or from a charge by an agency employee or applicant (e.g., employment agency records may reveal *per se* ADA violations by a client employer). Investigations should cover recruitment and referral practices as well as an agency's own employment practices and include interviews of former employment counselors.

**(c) *Scheduling Considerations*.—**EEOC initiated investigations designed to raise the level of compliance within industries and jobs having a high incidence of non-compliance are integral to EEOC's enforcement effort under all four statutes. Supervisors may recommend Commissioner charges or schedule respondents for directed investigations based upon TMC guidance, data in the lead file, or based upon leads submitted by investigators or other staff or based on data from outside sources. Coordination on at least a District-wide level should be assured before initiating an ADEA/EPA directed investigation. In the initial period of ADA enforcement, information which comes to the field office's attention on *per se* or other substantive ADA violations will ordinarily be pursued via Commissioner charges.

**(d) *Scope of Investigations*.—**Supervisors may decide the scope and limitations of ADEA/EPA directed investigations made in the unit, including the period to be covered by the investigation, unless direction is given by TMC (see §§12.2(b), 22.3 and 22.4). Define the general focus of the investigation when a directed case is assigned or when a Commissioner charge is being recommended. An investigation may be focused or limited in several ways, depending on the scope of the alleged or indicated violations or the "design" of a directed or Commissioner charge program. Thus, an investigation may be limited to:

(1)     A particular department or division of an establishment;

(2)     One facility or group of facilities in a multi-unit enterprise;

(3)     One or more classifications or groups of employees;

(4)     One or more bases, stated in terms of an excluded group or as a preference, e.g., "young white males preferred in …"

(5)     A practice stated generally (wages or hiring) or specifically (denial of training opportunities to persons with disabilities - effect on promotions);

(6)     A period of time shorter than the full statutory limitation periods on recovery or relief; or

(7)     Any combination of the above, e.g., "preference for young whitemales; sales rep hiring; promotions to sales supervisor; all branches in Midwest Region, from date of hiring of current general sales manager to present."

© 2025 CCH Incorporated and its affiliates and licensors.          2          Jul 23, 2025 from VitalLaw®
All rights reserved.

VitalLaw® 

## §8.6, *Special Procedures for Monitoring Advertising Practices*, Equal Employment Opportunity Commission

EEOC Compliance Manual
EEOC Compliance Manual ¶376

Click to open document in a browser

See §632 for interpretive guidance on discriminatory job advertisements. As advertisements most often violate the Acts by stating or implying sex or age preferences or containing wording which tends to deter applicants of a particular sex or age group, most of the illustrations below deal with sex or age based issues. However, EEOC should follow up on all discriminatory ads, including those based on race, religion, national origin, or disability. Enforcement Management should establish a system for review of job advertising to the extent necessary to address continued Title VII, ADA, and ADEA advertising violations in the field office jurisdiction. When a potentially discriminatory job ad comes to EEOC's attention, follow the procedures below to investigate or extend voluntary assistance.

**(a)** *When No Immediate Action Is Taken.***—**If no immediate action is taken by the field office, identify the discriminatory ad by date and publication and file it in the lead file (see §8.2(a)). Evidence of repeated violations, however, should be considered for investigation, prompt conciliation, and litigation.

## (b) *When Immediate Action Is Taken*

**(1)** *Consider a Commissioner Charge or Directed Investigation.***—**In situations which come to EEOC's attention regarding an advertisement or notice containing age or sex specifications, preferences for youth, or other clearly discriminatory language, e.g., "maximum age 35," "young" or "men wanted," consider requesting a Commissioner charge or initiating a directed investigation to determine if the respondent has an unlawful hiring or referral practice. Give particular emphasis to this approach when the advertisement's specifications clearly indicate hiring violations, such as maximum age limits or sex-based exclusions. See §8.2(b)(9) when the advertisement or notice involves an employment agency.

**(2)** *Alternative When Resources Preclude Investigation.***—**If EEOC becomes aware of a clearly discriminatory ad or notice as described in (1) above and resource constraints preclude initiating an investigation, the following procedure may be used to assist the advertiser in avoiding potential violations of the Acts. Oral agreements to discontinue discriminatory practices should be confirmed by letter. This procedure implements EEOC's policy of providing voluntary assistance.

(i)     Letter 8-A may be sent to the employer, employment agency, or union placing the ad or notice. This letter should only be sent when there is a reasonable presumption that the advertiser is subject to the Act, e.g., an employer with 15/20/25 employees, and the ad is clearly discriminatory (however, handle terms such as "Junior Accountant" as described in (3)(ii) below).

(ii)    This voluntary assistance action is *not* an investigation under Title VII, ADA or ADEA; therefore, do not docket it. Keep a record of the action in the lead file. So long as the advertiser's response is positive and discriminatory ads are discontinued, no further action needs to be taken.

(iii)   If the advertiser contests the legality of the practice, gives an indication of intent to continue discriminatory hiring practices (while discontinuing the ads), or subsequent illegal ads come to EEOC's attention, a directed investigation should ordinarily be made or a Commissioner charge requested.

**(3)** *Procedure when Advertisement Discrimination Is Less Apparent.***—**The legal unit may be consulted if the discriminatory nature of an ad or notice is unclear, or if it appears that a statutory exception may apply to the job.



A respondent may defend an advertising practice by claiming that the underlying employment action is excepted under the act, e.g., where sex, religion, or age is a BFOQ reasonably necessary to the operation of a particular business. An example would be an employer recruiting applicants for a specific job to specify "young men and women" when it has obtained a final decision of the courts that a maximum age of less than 40 is a BFOQ for that job.

**(i) *Terms Which Are Sex- or Age-Related or Otherwise Deter Workers from Applying.*—**Some ads may have the effect of deterring women, older workers, or other protected classes from applying even though the ad does not contain direct sex, age or other prohibited specifications or preferences. Generally, such ads fall into two categories. First, the ad may describe a policy which appears to be neutrally stated but which adversely affects a protected class. ADEA examples are "college student", "recent college graduate", or "no more than three years experience." Terms such as "recent education/experience" may also affect women wishing to reenter the workforce. "Recent experience" may affect minority groups with a higher incidence of long term unemployment.

> Second, some ads may describe the employer or job in a manner designed to deter workers from applying, e.g., "Young company seeks eager go-getters for…" (These types of ads can point to discriminatory hiring practices by respondents with a higher level of sophistication and awareness of Title VII, the ADA, and the ADEA. Or an ad may specify, "Medical exam required—must not show any limiting conditions." In these cases, consider investigating the respondent's *hiring* practices, focusing initially on preserving the evidence (by on site investigation, if possible) which identifies protected class applicants (see also §§14.3(a)(3) and 25.3(d)).

**(ii) *Ads Which Use Customary Terms.*—**Some ads contain customary terms such as "Junior Accountant" and do not contain any other terms which might discourage particular applicants. Ordinarily take no action on such ads unless a charge has been filed. If a person seeking to file a charge has not actually applied for the job, s/he should be asked to apply, if there is still time under the terms of the ad, and to file a charge later if s/he believes sex or age was a factor in not being hired (of course, the charge will be accepted without such action if the party so insists).

© 2025 CCH Incorporated and its affiliates and licensors.
All rights reserved.
Jul 29, 2025 from VitalLaw®

VitalLaw®

 Wolters Kluwer

## **Exhibit 8-A, Equal Employment Opportunity Commission**

EEOC Compliance Manual
EEOC Compliance Manual ¶380

Click to open document in a browser

***(FIELD OFFICE LETTERHEAD)***

Address to respondent

Dear :

The Equal Employment Opportunity Commission administers Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990 (ADA), and the Age Discrimination in Employment Act of 1967 (ADEA) which protect persons from discrimination based on race, color, religion, national origin, sex, age and disability in most phases of employment.

Attached is a clipping from the help wanted ads of the **[name of publication]** for **[date]** in which you indicate a preference based on **[specify basis]** for prospective applicants. The publication of such ads by employers of **[15/20/25]** or more employees, employment agencies serving such employers, or unions with 25 or more members, violates **[Title VII/the ADA/the ADEA]**, unless an exception applies. Therefore, we have decided to call this matter to your attention and to provide you with a copy of relevant Commission guidelines.

Please review this matter to determine what changes in your recruitment and hiring practices may be necessary to comply with **[Title VII/the ADA/the ADEA]**. If you are not certain how the law applies in your case, please write this office for assistance or call at **[number]**.

Sincerely,

Investigation Supervisor

Enclosures

***(LETTER REGARDING CLEARLY DISCRIMINATORY JOB AD OR NOTICE, WHEN EEOC DOES NOT PLAN IMMEDIATE ACTION)***

***Exhibit 8-A***

VitalLaw® 

# §14.2, *Preliminary Investigative and Settlement Actions*, Equal Employment Opportunity Commission

EEOC Compliance Manual
EEOC Compliance Manual ¶522

Click to open document in a browser

There are occasions when compliance activity before or concurrent with service of a charge is appropriate, as when time is of the essence or informality is needed. As described below, this may either be for enforcement reasons or because early settlement is clearly appropriate. Implicit in most of the options discussed below is the factor of delay in providing notice of the charge to the respondent. Any of the actions described below should be planned to ensure that the respondent receives notice of a Title VII/ADA charge within 10 days of filing.

**(a)** *Scheduling an On Site Investigation with Notice/Service of Charge.*—This approach can be useful not only to expedite investigations or to safeguard documents but also to offer some protection to confidential witnesses (see also §§25.2 - 25.3). If, for example, five employees in personnel were interviewed about the racial coding policy of their employer, it may be more difficult for the respondent to identify the "troublemaker."

**(b)** *Service of Subpoena with Notice/Service of Charge.*—In selected cases, in conjunction with the approach in (a) above, a "pocket subpoena" might be approved, for completion on site if needed, for documents which might otherwise be destroyed, altered or lost (see §§24.2(d), 25.2(b)(1), and 25.3(d)). Upon a failure to comply with the subpoena, a TRO could be sought as set out in §13 and (c) below.

**(c)** *Request for TRO Before Notice/Service of Charge.*—This approach is important not only for ongoing harassment or when a discharge is imminent, but also when there is a possibility that documents would be destroyed without a court order (e.g., when a respondent refused to permit an on site investigation or failed to comply with a subpoena.) Some offices have been able to get TROs entered within days of being informed about possible records destruction and have had the records seized by the U.S. Marshall (e.g., *EEOC et al v. Defensive Arts, etc.*, No. 91-418-N (E.D. Md. 1991) (TRO Baltimore District Office 7/12/91).

**(d)** *Conducting Witness Interviews Before Notice/Service of Charge.*—Early witness interviews can help to preserve the testimony of witnesses who may not be readily available later, as when a witness is relocating, currently unemployed, or otherwise readily available now for a daytime interview.

**(1)** *Evidence Pointing to Possible Violations.*—Early interviews can help to preserve the testimony of witnesses who may be intimidated or coached after the respondent becomes aware of the charge; those who may have key information or may be able to verify key information (an incident described or key records available); those who are custodians of records or who may be able to provide essential information on actual policies, recordkeeping practices, location of records, etc.; or any of the witnesses described above who might assist EEOC in planning the investigation, deciding whether to go on site, etc.

**(2)** *Possible No Cause or Withdrawal.*—Conversely, there may be witnesses who are asserted to support CP's position where negative interviews, before notice/service of the charge, might lead to a withdrawal (see §4.1(h) regarding this option and the benefit to a charging party who thereby avoids exposure to retaliation) or other prompt closure of the charge with little or no further investigation. This should not be construed as an encouragement to do less than the required level of investigation consistent with EEOC's full investigation policy. However, a frank discussion with the charging party after such interviews may, based solely on the merits, lead to a request for withdrawal, counsel's request for a right to sue letter, or a dismissal when the charging party's statement is not credible, is controverted by witnesses, and continued investigation cannot be justified.

 Wolters Kluwer

**(e) *Settlement Before or Concurrent with Notice/Service of Charge.*—**Charges described below, while informally handled, should always be entered in CDS to document respondent's compliance history. (See §§14.3(a)(2), 14.7 and 15 for a discussion of settlement standards.)

**(1) *Individual Claim Against a Systemic Respondent.*—**A settlement attempt may be appropriate for a class member during a systemic investigation when an individual charge is not (yet) filed and the circumstances suggest quick resolution if brought to the respondent's attention.

**(2) *Individual Claim Against Cooperative Respondent.*—**A variation on (1) is a situation such as when EEOC has just settled or conciliated a major investigation of a cooperative respondent and an inquiry is received shortly thereafter. The new claim may or may not be related to the prior agreement but, based on the information presented, it is clearly not evidence of a willful violation and should be settled. In situations such as these, oral notice of the charge is given by virtue of the informal settlement attempt and written notice is then given by reference to the charge in Exhibit 15-A, Settlement Agreement; in Letter 15-C, Acknowledgement of Settlement (see §15.8(b)); or in an addendum to the prior settlement or conciliation agreement (if that agreement was pending a compliance review— see §§80.7 and 80.13).

## **(3) *Actions Designed to Facilitate Settlement When Settlement Is Appropriate***

When the inquiry involves a matter suitable for settlement as described in (1) or (2) above (or §14.3(a)(2)), the field office may adopt a variety of approaches directed at obtaining an early resolution. Regular contact among field offices and FMP as to what works is encouraged. For example, a field office might report that conveying specific information as to charging party's losses to the respondent in such cases generates settlements (e.g., a "Pay Calc" computation of wage losses to date and the accrual rate for each month of delayed settlement is forwarded to the respondent with the Notice of Charge).

**(4) *Retaliation Cases.*—**In some retaliation cases, the bad actor is a supervisor or second-level manager acting without higher management's knowledge or approval. The behavior may in fact violate company norms as well as the law. Employee witnesses may have been coached and those refusing to go along are discriminated against or threatened. The essential question as a practical matter may be, does higher management want what lower management has created? Immediate action (e.g., an on site visit the same day to a nearby respondent) by the investigator to get the retaliation abated without formal charges, or by delivery of a Notice of Charge to higher management the same day EEOC learns of the retaliation, can restore the status quo and keep the underlying investigation on track.